

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| Roche Diagnostics Corporation<br>9115 Hague Road<br>Indianapolis, IN  46250-0457<br><br><br><br>Plaintiff,<br><br>v.<br><br>Dina Wein Reis<br>60 East 42nd Street, Suite 2301<br>New York, NY  10165<br><br>Sara Golden<br>60 East 42nd Street, Suite 2301<br>New York, NY  10165<br><br>Chaya Cooper<br>60 East 42nd Street, Suite 2301<br>New York, NY  10165<br><br>Craig Schwimmer<br>60 East 42nd Street, Suite 2301<br>New York, NY  10165<br><br>On-Call, Inc.<br>60 East 42nd Street, Suite 2301<br>New York, NY  10165<br><br>The Complete Solution, Inc.<br>60 East 42nd Street, Suite 2301<br>New York, NY  10165<br><br>Sion Enterprises, Inc.<br>60 East 42nd Street, Suite 2301<br>New York, NY  10165 | **1 : 07-cv- 0034 -DFH -WTL**<br><br>**CIVIL RICO COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

and                                              )
                                                 )
CMB Management, Inc.                             )
60 East 42nd Street, Suite 2301                  )
New York, NY  10165                              )
                                                 )
                   Defendants.                   )
_____         )

        Plaintiff Roche Diagnostics Corporation ("Roche"), by and through its undersigned

counsel, files this Complaint on its behalf, against defendants Dina Wein Reis ("Reis"), Sara

Golden ("Golden"), Chaya Cooper ("Cooper"), Craig Schwimmer ("Schwimmer"), The

Complete Solution, Inc. ("TCS"), On-Call, Inc. ("On-Call"), Sion Enterprises, Inc. ("Sion"), and

CMB Management, Inc. ("CMB"), Jane Does #1 through #10, and John Does #1 through #10,

and XYZ Corporations #1 through #10, and alleges the following:

## NATURE OF THE ACTION

        1.      This is a suit to remedy a fraud perpetrated against Roche by the defendants, who

by an elaborate scam perfected over at least the past 10 years against many major consumer

brand companies throughout the nation, bilked Roche out of nearly $12 million worth of diabetes

care products.  While secretly dangling a non-existent multi-million dollar CEO position before a

high-ranking Roche executive, defendants were able to secure the diabetes care products for an

85% discount based on their repeated representations and assurances to that executive that the

products would be used exclusively for promotional purposes to a new line of potential

customers.  Instead, in accordance with their fraudulent pattern of misconduct over many years,

defendants diverted or attempted to divert the products at tremendous mark-ups to Roche's own

2

customers, thereby depriving Roche of sales and profits and jeopardizing its good will. Roche

has suffered a loss of over $10 million as a result of defendants' well-practiced fraud.

2.      Roche brings this suit for compensatory and punitive damages, rescission,

replevin, and injunctive relief to redress and prevent injuries caused by the pattern of fraudulent

and criminal acts of mail fraud, wire fraud, common law fraud, and conversion perpetrated by

defendants in operation of their criminal enterprise causing injury to the business and property of

Roche. The enterprise consisted and/or continues to consist of the corporate defendants On-Call,

Inc., Sion Enterprises, Inc., and CMB Management, Inc. (individually and in the collective, "the

Enterprise"). The Enterprise is and has been operated at all times germane to the allegations

herein through the on-going pattern of racketeering acts by TCS and the individual defendants,

Dina Wein Reis, Sara Golden, Chaya Cooper, Craig Schwimmer.

3.      Defendants Reis, Golden, Cooper, Schwimmer, and TCS, operating in and

affecting interstate commerce, defrauded Roche by holding out defendant TCS as a purported

holding company with a number of allegedly legitimate businesses in its portfolio. TCS and the

individual defendants falsely represented to Roche that one such company, defendant On-Call,

provided promotional samples to an exclusive network of 10,000 independent pharmacies

("independents") whose responses to Roche's products would be supplied to Roche in a

marketing analysis report. The individual defendants and TCS, operating through On-Call,

further represented that if, as they repeatedly assured Roche was likely, the report proved

favorable, a large follow-on order would be placed allowing the product exclusivity in its

3

category to the substantial network of independent pharmacies, an order estimated to be worth $35 million.

4.      Unknown to Roche at the time of the representations, the Enterprise established by Reis and her accomplices to defraud major consumer brand manufacturers throughout the country has been established for at least ten years under various names and continues to date under the names of various shell companies and numerous purported sampling programs.  At all relevant times the Enterprise operated for the principal purpose of enriching Reis and her accomplices by purchasing consumer products under false pretenses at substantial discounts and improperly diverting those consumer products for sale into the domestic market, thereby reaping large profits for defendants and depriving duped manufacturers of sales and profits from regular customers.

5.      In reliance upon repeated false and misleading representations made by On-Call, TCS, and the individual defendants in person and through the use of interstate mail and wires, Defendants fraudulently induced Roche to sell, on or about September 20, 2006, $11.6 million worth of perishable and regulated diabetes care products to the Enterprise for only $1.7 million, an 85% discount off prices ordinarily charged for merchandise intended for the U.S. domestic market.  Plaintiff asserts claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO"), Indiana Civil Remedies for Racketeering Activity, Ind. Code § 34-24-2-6, and under the common law of the State of Indiana for defendants' theft and fraud.

6.      In December 2006, the Enterprise, operating under the alias Sion, approached the Walgreens Company ("Walgreens"), a national pharmaceutical chain and a long time regular

4

customer of Roche, attempting to sell very substantial portion of the goods that were fraudulently

obtained from Roche by On-Call.  Documentation provided to Walgreens by Sion reveal that

over 90% of the goods sold to On-Call by Roche had been allegedly sold by On-Call to CMB,

another sham company of the Enterprise.  Not coincidentally, TCS, On-Call, Sion, and CMB all

share the same address, suite number and telephone number and, on information and belief, the

same management and operatives, namely defendants Reis, Golden, Cooper, and Schwimmer.

As a result of the discussions between Walgreens and Sion and the documents provided, it

appears that most of the diabetes care products that Roche was fraudulently induced to sell to

On-Call are still in the possession, custody and control of defendants at a warehouse in Edison,

New Jersey.  Roche seeks a temporary restraining order and preliminary and permanent

injunction against Sion and CMB restraining the sale or transfer of the merchandise, freezing any

movement of the merchandise, and ultimately an order for replevin of the merchandise.

## THE PARTIES

7.    Plaintiff Roche is and was, at all times germane to the allegations herein, a

corporation organized under the laws of the State of Indiana, with its principal place of business

at 9115 Hague Road, Indianapolis, Indiana.

8.    Upon information and belief, and at all times germane to the allegations herein,

defendant Reis is and was a resident of New York City and Jerusalem, Israel. Upon information

and belief, Reis is the President and owner of TCS, On-Call, Sion, and CMB.

5

9.      Upon information and belief, and at all times germane to the allegations herein, defendant Cooper is and was a resident of New York and held herself out, among other things, as an alleged employee of TCS.

10.     Upon information and belief, and at all times germane to the allegations herein, defendant Golden is and was a resident of New York and held herself out, among other things, as an alleged employee of On-Call and Sion.

11.     Upon information and belief, and at all times germane to the allegations herein, defendant Schwimmer is and was a resident of New York and held himself out, among other things, as an alleged employee of TCS and Sion.

12.     Upon information and belief, defendant TCS purported to be and was, at all times germane to the allegations herein, a corporation organized under the laws of the State of New York and operating from a location in New York City, 60 East 42nd Street, Suite 2301.

13.     Upon information and belief, defendant On-Call, at all times germane to the allegations herein, purported to be and was a corporation organized under the laws of the State of New York and operating from a location in New York City, 60 East 42nd Street, Suite 2301.

14.     Upon information and belief, defendant Sion purported to be and was, at all times germane to the allegations herein, a corporation organized under the laws of the State of New York and operating from a location in New York City, 60 East 42nd Street, Suite 2301.

15.     Upon information and belief, defendant CMB purported to be and was, at all times germane to the allegations herein, a corporation organized under the laws of the State of New York and operating from a location in New York City, 60 East 42nd Street, Suite 2301.

6

16.     Defendants Jane Doe #1 through #10 and John Doe #1 through #10 are individuals who have conducted and participated in and aided and abetted the named defendants herein in conducting the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(a), (c) and (d), as set forth below and whose identities are not presently known.

17.     Defendant XYZ Corporations #1 through #10 are corporations, partnerships and other business entities or organizations who have conducted and participated in and aided and abetted the named defendants herein in conducting the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(a), (c) and (d), as set forth below and whose identities are not presently known.

**JURISDICTION AND VENUE**

18.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 (a)(1), in that plaintiff is a citizen of Indiana, defendants are citizens of New York, and the matter in controversy exceeds the sum of $75,000, exclusive of costs and interests.  This Court also has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367, and 18 U.S.C. § 1964 (a) in that RICO claims arise under the laws of the United States, and the state law claims are so related to the RICO claims that they form part of the same case or controversy and the Court has pendent jurisdiction over the state law claims under the common law and the Indiana racketeering statute.

19.     Venue is predicated on 28 U.S.C. §§ 1391 (b) (2) and (d) in that a substantial part of the events or omissions giving rise to the claim occurred in this district.  In addition, pursuant

to 18 U.S.C. 1965(a) and (b), venue is proper in this district as defendants transacted their affairs

in this district and the ends of justice require that the defendants be brought before this Court.

## FACTS

### A.   Background

20.    Roche is in the business of, among other things, manufacturing and selling

diabetes care and monitoring products.

21.    The Enterprise, through the racketeering acts of Reis, Golden, Cooper, and

Schwimmer and TCS, induced Roche to sell certain diabetes care and monitoring products ("the

Roche products") to On-Call at substantially discounted prices by falsely and fraudulently

representing both orally and in writing that the Roche Products would be distributed through On-

Call's "Call-Kit" program as samples to "numerous independent pharmacies and drug stores,

their staffs and their clientele."  Thereafter, based on the results of an alleged independently

produced marketing study, a 6% or more acceptance rate would lead to a large follow-on order

permitting the Roche brand products exclusivity in its category to the substantial network of

independent pharmacies.  The representations were made to Roche representative Donald

Dumoulin ("Dumoulin"), senior vice president for diabetes care for North America.  Defendants'

representations were knowingly false when made.

### B.   The Scam Begins Through the Seduction of a Corporate Executive and an Offer of a Multi-Million Dollar CEO Position that in Fact Was Not Available

22.    In December 2005, Dumoulin, at that time, Roche's senior Vice President of

Diabetes Care for North America, was contacted by an individual who purported to be an

executive recruiter searching for a successor to a CEO of a privately held company.  The alleged

8

recruiter told him that the CEO looking to be replaced ran a private holding company controlling over 60 allegedly successful operating companies and that the incredibly wealthy CEO was intending to step aside to focus on charitable projects.  The recruiter stated that the call was intended to gauge interest in the position, which was located in New York City.  Dumoulin expressed an interest in pursuing the position, and the recruiter indicated there would be follow up in early 2006.

23.     In mid-January 2006, defendant Chaya Cooper in a follow up phone call to the executive recruiting call contacted Dumoulin.  Cooper purported to be the vice president of The Complete Solution, Inc., the company in search of a new CEO, and purported to provide Dumoulin background information about the company and its present owner and CEO, a woman to whom she referred only as "Dee" but now known to be defendant Dina Wein Reis.  Cooper claimed that the largest company held by TCS, described as its core business, was a distribution business, On-Call, Inc., which consisted of a private membership network of 6,500 independent pharmacies.  She also told Dumoulin that the CEO would also manage other related and affiliated companies, including an advertising agency, a reinsurance company, various land projects, and an accounting firm.  Ms. Cooper told Dumoulin that "Dee" wanted to recruit an executive capable of running the various businesses that she had assembled and built so that she could concentrate on charitable causes.  Cooper promised compensation of over $2 million per year and ended the conversation by telling Dumoulin that if he were still interested in the position, she would arrange a call with the CFO of the company.  Dumoulin agreed to another call, and gave

9

her various telephone numbers, including his home and cell phone numbers. Upon information and belief, it is now known that no such position was available or intended for Dumoulin.

24.     Over the course of at least the last ten (10) years, scores of executives of other corporations were also approached by alleged representatives of the various entities used by defendants and told that they were being seriously considered for high paying executive positions as part of the Enterprise's ruse. Upon information and belief, such corporations include, but are not limited to: Alcon Laboratories, Allergan, Aurora Foods, Balance Bar, Bausch & Lomb, Bayer, Beech Nut, Beirsdorf, Benckiser, Bertolli USA, Best Foods, Bic Corporation, Binney & Smith, Borden, Inc., Bristol-Myers, Campbells Soup Company, Carter Wallace, Castleberry/Snow, Celestial Seasoning Inc., Chattem Inc., Chesebrough Ponds, Chiquita, Church & Dwight, Ciba Vision, Colgate, Cumberland Packing Corp., Eastman Kodak, Ferrara Pan Candy, Fleishmans, Georgia Pacific, Gilette Company, Jelly Belly, Heinz USA, JB Williams, Jergens, JM Smucker, Kashi, Kikkoman Int'l Inc., Kimberly-Clark, Kraft, McCormick, McNeil Consumer Products, Motts USA, Mt. Olive Pickles, Nestle Frozen, Nestle, New World Pasta, Quaker Oats, Quigley Corp., Red Gold Inc., Reily Foods Co., Sara Lee Company, Schering-Plough, SmithKline, Solo Cups, Spangler and Yardley of London.

25.     In mid-February 2006, Dumoulin was again contacted by telephone by Chaya Cooper when she explained in more depth the core business she described in her previous conversation. In this call she also suggested that Dumoulin should arrange to have Roche sell its products to On-Call as part of this program. She described a program in which there were 6,500 independent pharmacies that paid a membership fee to have exclusive distribution opportunities

of products by selected manufacturers.  She claimed that these manufacturers participate in the

program in order to receive exclusive distribution in these member pharmacies.  Ms. Cooper

claimed that her company would purchase products from a manufacturer at an 85% discount and

provide the product to stores in gift bags to develop consumer business and goodwill.  According

to her, once the product is deemed successful, subsequent orders are purchased at full price

minus 2% cash discount, and all orders are paid prior to shipment via wire transfer.  She claimed

that 96% of tested product is successfully moved into full distribution and that TCS was currently

doing business with 25-30 reputable manufacturers, all of which now have exclusive distribution

rights in the 6,500 independent pharmacies.

C.     **While the Illusory CEO Offer is Dangling, the Executive is Wined, Dined and
       Enticed by Promises of Multi-Million Dollar Sales To Defendants' Customers**

       26.     It was during this February phone call that Cooper asked Dumoulin about Roche

Diagnostics' products.  In response, he sent the defendants samples (a meter and strip) and a

pricing list.  In connection with the possibility of Roche Diagnostics participating in the program,

as suggested by Cooper, Dumoulin asked her whether the product was ever diverted to the

wholesale or retail trade.  Defendant Cooper explicitly and emphatically assured Dumoulin that

there was absolutely no diversion to the wholesale or retail trade, that this was legitimate

business and that the company had a long history of excellent relationships with manufacturers.

On February 24, 2006, Roche received via UPS a Media Kit about TCS's core company, On-

Call, Inc., from Ms. Cooper in connection with a proposed transaction with Roche.

       27.     On or about February 22, 2006, Dumoulin first spoke with "Dee."  Defendant

Reis claimed that an associate in the industry referred him to her, but that she did not remember

11

who it was. She described how she had built her business from the ground up over the past 20 years from a small import business through her purchase of majority control of companies over the years. She told Dumoulin that the conglomerate's core business was her "original baby," that a woman named Sara Golden does a good job leading it, and that the business was 100% above board with great partner relationships. She then invited Dumoulin to meet with her in New York City.

28.     At defendant Reis' invitation, Dumoulin traveled to New York City in March 2006 to discuss the alleged CEO position. TCS paid for Dumoulin to travel to New York City on or about March 23, 2006, and paid for all of his expenses, including food, hotel, and air fare. At dinner that evening, defendant Golden attempted to interest Dumoulin in the allegedly available CEO position and touted the benefits of On-Call's alleged promotional programs.

29.     On March 24, 2006, Dumoulin was escorted through a parade of people who were represented as defendant Reis's associates and was taken to the TCS offices in New York City located above Grand Central Station at 60 E. 42nd Street, Suite 2301. This is also allegedly the address of defendants On-Call, Sion and CMB. Dumoulin was ushered into a conference room off the lobby where he met Michael Mermelstein, presented as TCS's acting CFO, who described the alleged profitability of the businesses Dumoulin would run if selected as CEO. Dumoulin also met individuals posing as those who run defendant Reis's alleged real estate and reinsurance businesses. Later in the day Dumoulin was taken by limousine to an impressive 6-story brownstone at 79th and Riverside Dr which was described as defendant Reis's home. It was here that he first met defendant Reis and the two talked for about two hours. She described many of

12

her purported businesses and told Dumoulin that she was looking for someone to run the

business organization.  When leaving these premises, Dumoulin was introduced to a woman who

defendant Reis claimed was the curator of the Whitney Museum of Art in New York City and

who also manages defendant Reis's personal art collection.  This woman showed Dumoulin three

pieces of art in the home allegedly belonging to defendant Reis that she claimed were worth over

$25 million each.  After the meeting and the fabulous display of wealth, Dumoulin told defendant

Reis that he was still interested in the CEO position.  At no time did any of the defendants or Mr.

Dumoulin ever advise anyone else at Roche of their discussions for Mr. Dumoulin to become

CEO of the Reis companies.  Defendants deliberately created a conflict of interest that Dumoulin

could not disclose and that clouded his judgment in going forward with the proposed sale of the

Roche products to the defendants.  As revealed in other judicial complaints, this creation of the

conflict of interest was part of the *modus operandi* of defendants in pursuit of their scam.

**D.      Defendants Attempt to Assure Roche Against the Possibility of Diversion Through
         the Use of Staged Store and Warehouse Displays and Alleged Corporate References**

30.      In mid-April 2006, from Indianapolis, Dumoulin telephoned defendant Chaya

Cooper in New York City to ask for business references for On-Call, Inc. in connection with

consideration of On-Call's promotional program she had proposed for Roche Diagnostics.  Later,

defendant Cooper called back to Dumoulin's office in Indianapolis and provided Dumoulin the

names and phone numbers of two alleged corporate references.  In early to mid-May 2006, each

of these references was contacted by Dumoulin via phone.  Each claimed to have worked with

TCS, gave glowing recommendations to TCS's key personnel, assured Dumoulin that the

business was "incremental," that is, it was in addition to other sales and was not a replacement

13

for any such sales, and commented that the defendants had delivered on all of their promises. These representations were knowingly false.

31.     In June 2006, Dumoulin traveled to New York City, where he was taken by defendants to a warehouse in New Jersey and shown how the promotional program would work. He was also taken by defendant Cooper to a number of independent pharmacies in New Jersey that were allegedly part of the independent network. He was shown products of the companies used as references that were allegedly sold exclusively in their categories at these stores. During this visit, the defendants advised that they had added another 3,500 independent pharmacies to their network bringing the total to 10,000 stores. These representations were knowingly false and the presentations at the pharmacies were deliberately and misleadingly staged.

32.     Months later, on September 19, 2006, on the eve of the sale one of the same references would again be contacted by Wayne Burris, Roche Diagnostics CFO, and David Burns the VP of Finance for Diabetes Care, to reaffirm the positive references given to Dumoulin. In that telephone conference, the reference confirmed what he had previously represented: that he had performed due diligence on TCS, had worked with TCS to add incremental volume to its sales, and was confident that TCS were not diverters He stated that TCS had delivered on all the promises its representatives had made. These statements were knowingly false when made, as defendants intended. As a result of these false assurances, Messrs. Burris and Burns permitted the sale and shipment to go forward.

33.     As defendants intended, Roche relied heavily and to its substantial detriment on the false assurances of these references in proceeding with the sale to On-Call.

14

34.     In early June 2006, defendant Reis called Dumoulin to follow up and gauge his

interest in the CEO position.  She suggested that one way to "check out" the organization was to

do business with her companies in the promotional distribution program as previously suggested

by Cooper.  Defendant Reis "guaranteed" that the distribution project would be beneficial for

Roche and said that she had never let down a business partner.  Dumoulin told her that he would

evaluate the business opportunity for Roche Diagnostics and that he and his wife would continue

to consider the CEO position.  As intended by the defendants, the dangling offer for a non-

available CEO position clouded Dumoulin's judgment about accepting the defendants' proposal

that Roche supply to defendants for alleged promotional purposes, a substantial amount of

diabetes care equipment at approximately 15% of its wholesale value.

**E.      Defendants Place an Order for the Alleged Sampling Program
          and Continue to Dangle the Unavailable CEO Position**

35.     In mid-June 2006, defendant Cooper from New York City telephoned Dumoulin

at Roche's offices in Indianapolis and placed an order for 18 lots of diabetes care products or

approximately 318,000 units.  She stated that, according to her calculations, Roche could expect

a follow-up order on these products in excess of $35 million.  Dumoulin took the order under

advisement, while noting that it was extremely large for a promotional program.

36.     Before Dumoulin again spoke with Cooper, defendant Reis from New York City

called Dumoulin in Indianapolis on or about June 27, 2006.  She urged him once again to take

the CEO position, even though she well knew that she had no intention of relinquishing it or

letting him accept it.  Dumoulin explained to her that he was not interested in the CEO position

because of its location in New York City.  She claimed that she was disappointed and wished

15

him luck but urged him to continue to consider positively the promotional distribution program for Roche Diagnostics. He agreed that he would continue to evaluate the program.

37.    In early July 2006, while Dumoulin was still considering the possibility of the On-Call distribution program, Dumoulin received another telephone call from defendant Reis in New York City, in which she claimed that she would not accept his decision with respect to the CEO position. She invited Dumoulin and his wife to meet her and her husband in New York City. She claimed she was convinced that Dumoulin was the right person for the position and, if necessary, she was willing to make living arrangements at no cost to him or his wife so that he could take the position.

38.    On July 16, 2006, Dumoulin received another interstate telephone call from defendant Reis in advance of their New York meeting. She stated that she was "looking forward" to putting another "link in the chain" so they could get together as "a permanent couple." She was also excited to "make this partnership happen sooner than later." She mentioned that she "wanted to give [Dumoulin] a big hug," and tell him "thank you" for being "an understanding, brilliant, competent, not-take-no-for-an-answer, solution finding person." Two days later on July 18, 2006, Chaya Cooper faxed Roche bank and delivery information for the proposed order.

39.    On July 19-20, 2006, at TCS's urging and expense, Dumoulin and his wife traveled to New York City. They met with defendant Cooper and a real estate agent, who showed them expensive apartments in fashionable sections of New York City as part of the alleged enticement to accept the non-available CEO position. Later, Dumoulin met with

16

defendants Sara Golden and Craig Schwimmer; purportedly the head of acquisitions for TCS, Inc., defendant Schwimmer falsely claimed that the company was pursuing potential acquisitions in the consumer products or pharmaceutical business. Later, Dumoulin was taken by limousine to the home at 79th and Riverside Drive in New York City where he again met with defendant Reis who reiterated that now was the right time for her to exit the business and for him to join the organization. His wife, after being treated by TCS to an all-day spa visit, joined them, along with defendant Reis's husband for dinner and an evening at the theatre to see "Rent." All of this entertainment was at no charge to the Dumoulins.

**F.     Defendants Press Roche to Move Forward With the Order While
       Continuing to Reassure Roche that the Products Would Not Be Diverted**

40.     On or about August 17, 2006, Dumoulin called defendant Reis in New York City to decline the alleged CEO position. She feigned regret, but urged him to go forward with the marketing program that she and her colleagues had presented to Roche. Dumoulin advised her that Roche was still interested in pursuing the promotional arrangement and relationship with TCS and continued to consider the proposal.

41.     On or about August 21, 2006, Dumoulin again traveled to New York City to probe the details of the proposed transaction on behalf of Roche. He pressed defendant Golden and the CPA Michael Mermelstein on the business model and was reassured emphatically by both of them that TCS was a legitimate business and the company had never and would never divert a product from the sampling program into Roche's regular wholesale market.

42.     In late August 2006, defendant Reis from New York City telephoned Dumoulin in Indianapolis to inquire whether Roche Diagnostics was moving forward with the promotional

17

sale to the independent pharmacies because the members of the buying organization needed

diabetes equipment.  She stated that if Roche Diagnostics were not interested, she would go to a

competitor of Roche.

43.     On or about September 12, 2006, Roche received a fax from Cooper with

purchase order, delivery instructions, warehouse FDA compliance, tax ID document, and

shipment instructions.  As pared down by Dumoulin, the order requested 188,984 pieces of

equipment for a total sales price of $1.7 million.  The wholesale value of the items ordered was

approximately $11.7 million.  The delivery was to be shipped to the attention of Mike, 10

Executive Avenue, Edison, NJ 08817.

**G.    Roche Ships the Products Then Subsequently Discovers the Scope of Defendants'
        Scheme to Defraud, and the Existence of a Pending Civil RICO Action and a Host of
        Prior Law Suits Against Defendants For Virtually Identical Scams_____**

44.     On September 19, 2006, shortly after the final reference check described in

paragraph 32 above, the products were shipped from Roche's location in Indianapolis, Indiana.

Defendants TCS, On-Call, and the individual defendants assured Roche that the products would

be distributed without charge exclusively to the independent pharmacies as part of a promotional

program and that within 60 to 90 days Roche would receive, as a result of an independent

consumer survey, an order for approximately $35 million worth of product.  Defendants'

representations induced Roche Diagnostics to sell goods with a wholesale value of $11.7 million

for approximately $10 million less than they were worth.  As defendants understood and intended

all along, Roche has never received a survey or a second order.

45.     Following the shipment, Roche Security discovered information related to a similar diversion scam against Unilever connected to the DiPinto Brothers warehouse utilized by On-Call.  Roche discovered that Unilever had filed a federal civil RICO action against defendant Reis and her accomplices and corporations through which they acted in the Southern District of New York for perpetrating a similar fraud and diversion.  *See* First Amended Compliant, *Conopco v. Wein*, 05-CV-9899, (S.D.N.Y. June 2, 2006) (attached as Exhibit A).

46.     Since the shipment, Roche has discovered a letter written to a defrauded consumer brands manufacturer by a terminated employee of the Enterprise, Irith Hayblum ("Hayblum").  Hayblum's letter accurately described the pattern of fraud perpetrated by the defendants against numerous consumer brand companies.  The description of the fraud in the letter accurately depicts the fraud perpetrated against Roche and the fraud alleged by Unilever in its complaint.  The letter details, with insider knowledge, the active participation by defendant Reis and her accomplices, with numerous aliases and "phony" companies in other similar bogus programs in order to defraud other consumer goods companies.  The letter disclosed that defendants ran the various bogus programs out of offices located at 60 East 42nd Street, Suite 2301, New York, New York.  Upon information and belief, the numerous aliases used by Reis include, but are not limited to: Dina Wein, Dina Wein Reis, Lee Brent, Lee Preston, Brie Rees, Elizabeth Reft, Dee Refts, Marisa Refts, Cobbie Threston, Ava Weist, Dottie Weist, and Lee West.  The letter advised that defendant Reis and her colleagues "are relentless in their pursuit of innocent, unsuspecting victims."

19

47.     Defendant Reis and her accomplices have engaged in similar fraudulent schemes by using Collegiate Marketing, Inc, a defendant-affiliated front company, to obtain fraudulently products from Hershey Foods Corporation, Warner-Lambert Company, and Golden Grain Company (a subsidiary of The Quaker Oats Company) for the alleged "Collegiate Sampling Program." In reality, there was no collegiate sampling program, and once again, the defendants covertly diverted the fraudulently obtained products into normal wholesale channels to the detriment of the duped manufacturers. *See Hershey Foods Corp. v. Collegiate Marketing, Inc., Dina Wein et al,* (95 Civ. 10526 S.D.N.Y.); *Warner-Lambert Co. v. Collegiate Marketing, Inc.* (95 Civ. 05579 D.N.J); and *Golden Grain Co. v. Collegiate Marketing, Inc.,* (95 Civ. 3680 S.D.N.Y.).

48.     Based on their clear pattern of racketeering activity, the defendants conspired and operated the Enterprise knowingly and intentionally to defraud Roche when they claimed that Roche's diabetes care products, as part of a promotional program, would be placed in gift bags and sent as samples to independent pharmacies. It was always the intention and plan of the defendants to divert the products to the wholesale trade.

49.     Upon information and belief, contrary to the representations by defendants, there was no Call Kit Program, which distributed sample products to independents.

50.     Contrary to the representations by defendants, upon information and belief, On Call's market research study or report was a sham. In fact, no supporting documents, *e.g.*, customer interview forms, to date have been produced by defendants, to validate any results of the alleged sample distribution or Roche Products survey.

20

51.     Contrary to the representations by defendants, upon information and belief, there was no exclusive network of independents, nor any stores participating in it.

52.     In addition to TCS, On-Call, Sion and CMB, the various defendant-affiliated "holding companies" and promotional companies used by defendants since at least 1992 to date to target other manufacturers with the so-called "sampling programs" include, but are not limited to: 50+ Up, Alternative Marketing, Amenities International, Arrow Resources, Campstamps, Inc., Capitol Business Enterprise, Class Act Distribution, Coast-To-Coast, Collegiate Marketing, Crossroads Marketing, Crunch Time, CEB (Capital Business Enterprise), Eastern Capital Group, ECB, First Choice Markets, Inc., First Choice Marketing, Inc., Future Stars, Gold Star Marketing, Grade A, Great Divide, Great Outdoors Marketing, Inc., IL, Image Icon, Inc., International Alliance Marketing, Inc., KCG, LCG, Leading Capitol Group, Lifetime Marketing, Mature Marketing, Mercury Holdings, Native American Retail Ventures, Inc., New Frontier Marketing, New View Marketing, Inc., Next Generation Concepts, Perfect Score, Planet Camp, Prestige Acquisitions, Project Bliss, Inc., QB Holding, Quality Acquisition Corp., Quality Holding, Senior Advantage Marketing, Senior Focus Living, Senior Lifestyles, Senior Transitions, Smart Start, Student Advantage Marketing, Student View, Strategic Alliance Group, SW, Tag Holding, TCG Holdings, Trailblazers, Turning Point, University Connections, Ultimate Senior Attitudes, Venture Connections and Wonder Years.

53.     Upon information and belief, similar bogus programs run by Reis and the other defendants have included and include, but are not limited to:

        (i)     A Collegiate Sampling program;

21

(ii)     Gift Box program;

(iii)    Medi-Pak program;

(iv)    Spa-Kit program;

(v)     Product-Pak program;

(vi)    P-Kit program;

(vii)   Product Paq program;

(viii)  Product Box program;

(ix)    Golf Packs program;

(x)     Gift Paks program;

(xi)    "Goody-Pak" program; and the

(xii)   "Perfect Score" program.

54.     Upon information and belief, the Enterprise conspired fraudulently to induce

Roche to deliver the merchandise into the possession and control of On-Call.  Defendants

knowingly and intentionally misrepresented to Roche the true destination of these goods.  Thus,

upon information and belief, the Enterprise has obtained possession of Roche's Products through

fraud and deception.

**H.     Roche Discovers that Defendants Diverted the Products
         and Attempted to Sell Over 90% of the Products to Walgreens**

55.     On or about December 22, 2006, Walgreens' Security contacted Roche to validate

an offer to sell approximately $4.6 million of Roche products to Walgreens by the defendants.

The discount offered to Walgreens raised red flags and Roche was contacted to ensure that the

lots offered were not counterfeit and were not diverted.  In seeking to demonstrate to Walgreens

22

that the products are genuine and originated with Roche, the defendants faxed to Walgreens a patently phony invoice between On-Call and other companies under defendants' control, Sion Enterprises, Inc. and CMB Management, Inc. Each of these alleged companies all shared the same address, 60 East 42nd Street, Suite 2301, New York, New York.

56.    According to the shipping documents faxed to Walgreens by Sion, the alleged shipment from On-Call to CMB and Sion purported to ship the products from the DiPinto Brothers warehouse at 10 Executive Avenue in Edison, New Jersey, where defendants directed Roche to ship the products, to a new, unnamed warehouse at 220 Mill Road in Edison, New Jersey. An investigation of this facility has revealed that these addresses are two sides of the same location, the DiPinto Brothers warehouse. Upon information and belief, the goods sold to On-Call by Roche then offered to Walgreens are still located at the same warehouse in Edison, New Jersey to which Roche shipped them, and defendants are aggressively attempting to sell the products into retail channels.

57.    Unless properly handled or stored, the sensitive glucose strips, used to measure a diabetics blood sugar level, found in this shipment deteriorate and, as a result, lead to inaccuracy in their measurements. Sale of such degraded strips could result not only in damaging Roche's reputation for producing a quality product but may possibly harm individual diabetics that daily rely on those measurements to regulate blood sugar and insulin. In addition, if the products are sold to Roche's normal customers at tremendous discounts, Roche may lose not only its normal sales but also the good will of its regular customers.

23

58.     The covert diversion by the Enterprise of the Roche Products into the domestic marketplace has caused substantial damage to Roche in that Roche has been deprived of revenue believed to be not less than $10,000,000.

**I.     Defendants Have Preyed on Other Southern Indiana Corporations for Years**

59.     Appended to Unilever's publicly filed Civil RICO Complaint are spreadsheets prepared by defendants to memorialize their large-scale fraud against consumer brand manufacturers.  Exhibit A of the Unilever complaint provides a summary of information compiled and used by defendants, which identifies defendant-affiliated companies (see column entitled "Company"), corporate targets (see columns entitled "Manufacturer;" "Names at Manufacture;" and "Position"), and the job offer ruse (see column entitled "Status") which is part and parcel of the defendants' corrupt scheme.  Exhibit D to the Unilever complaint is a larger spreadsheet prepared by defendants containing similar information about additional companies targeted by defendants.  According to defendants' own records, defendants, through the use of the Enterprise, have targeted over 400 companies nationwide and have successfully defrauded at least 54 companies in 18 states.

60.     According to defendants' own records, defendants and their Enterprises' activities in Southern Indiana have not been limited to defrauding Roche.  Upon information and belief, based on defendants' spreadsheets appended to the Unilever complaint, on or around August 22, 2001, defendants, through use of the Enterprise calling itself Axis Holdings, Strategic Alliance Group, and Grade A Distribution, successfully defrauded Jarden Corporation, f/k/a/ Alltrista

24

Corporation, of Indianapolis, out of an unspecified amount of Forster plastic ware. *See* Ex. A (Exhibit D to the Unilever Complaint at U000297).

61.     Upon information and belief, based on defendants' own records, on or around May 1, 2003, Clabber Girl Corporation of Terre Haute, Indiana was defrauded of baking powder by the Enterprise calling itself Axis Holdings and Perfect Score Marketing. According to defendants' own records, Clabber Girl "[s]hipped and now hate us." *Id*. (Exhibit D to the Unilever Complaint at U000280).

62.     Upon information and belief, based on defendants' own records, defendants attempted to defraud three other companies in Indiana through use of the mail or wires. On or around October 23, 2003, defendants' Enterprise calling itself Axis Holdings attempted to defraud Enfamil and Polysol away from Bristol Myers Squibb's Evansville, Indiana location, but the company was "[n]ot interested." *Id*. (Exhibit D to the Unilever Complaint at U000274).

63.     Upon information and belief, based on defendants' own records, on or around May 1, 2003 and August 1, 2003, defendants' Enterprise calling itself Axis Holdings and Future Stars Marketing attempted to defraud Carbolite Food, Inc., of Evansville, Indiana, through use of the mail or wires, out of Carbolite bars but the company was "[n]ot interested." *Id*. (Exhibit D to the Unilever Complaint at U000278; Exhibit A to the Unilever Complaint at U000444).

64.     Upon information and belief, based on defendants' own records, on or around April 1, 2002, defendants' Enterprise calling itself Mercury Holding attempted to defraud Rit Dye from Unilever's Indianapolis location through use of the mail or wires but contacted the

25

"wrong person."  *Id.* (Exhibit D to the Unilever Complaint at U000322; Exhibit A to the Unilever Complaint at U000444, with Rit Dye as part of CPC Specialty Markets).

## COUNT I - AGAINST ALL DEFENDANTS

## FRAUD

65.     Roche repeats and realleges paragraphs 1 through 64, inclusive as if fully set forth at length herein.

66.     At the time of On-Call's purchases of the Roche Products, plaintiff justifiably relied upon the oral representations made by TCS, On-Call, Reis, Cooper, Schwimmer, and Golden as well as the Media Kit provided, that On-Call was in the business of distributing products as samples to independent pharmacies nationwide in its Call Kit Program, and that there was an exclusive network of 10,000 independent pharmacies.

67.     Defendants fraudulently concealed the following material facts, among others:

   a.   that defendants had already in place at the time of defendants' purchase of the Roche Products, a covert scheme to divert the Roche Products to the wholesale trade and to Roche's existing customers;

   b.   that the Roche Products that On-Call purchased from plaintiff were not for sample distribution to independents through the Call Kit program, but that at the time of On-Call's purchase of the Roche Products, defendants had already arranged through other companies under their control to divert the Roche Products;

26

c.  that Reis, the owner of On-Call, also conducted business using other companies, which Reis controlled, for the purpose of selling the consumer products, which had been sold to On-Call at reduced prices under the pretense that the products would be distributed in the Call Kit Program;

d.  that On-Call (as well as other companies) was being used as a front on behalf of Reis and her other companies to purchase product from Roche and others, which would then be transferred from On-Call to other Reis controlled companies for diversion to the wholesale and retail trade;

e.  that other Reis controlled companies, which received the product from On-Call and others, were in the business of diverting products or selling product to diverters;

f.  that defendants intended to sell all or virtually all of the product purchased by On-Call from Roche to wholesalers, retailers and other diverters;

g.  that the offer of the position of CEO of TCS to Dumoulin was not bona fide and merely offered as a ruse as part of a pattern to establish relationships with representatives of the companies targeted by defendants and intended to blind them, conflict them, and neutralize arms-lengths negotiations; and

h.  that there was no exclusive network of 10,000 independent pharmacies.

68.  Defendants possessed superior knowledge with respect to the material facts set forth in the foregoing Paragraph, which in good faith defendants should have disclosed and which facts were not readily available to plaintiff.  In connection with the failure to make the

27

afore-referenced disclosures, defendants knew that plaintiff was acting based on mistaken and materially incomplete knowledge.

69.     Defendants, in complicity with one another, concealed material facts set forth above from plaintiff and made false representations with knowledge of their falsity, with knowledge that plaintiff would rely on them, and with the intent and purpose of inducing plaintiff to sell the Roche Products to On-Call.

70.     Plaintiff was thus induced by false and fraudulent representations and omissions by defendants to offer and sell the Roche Products to On-Call at reduced prices.

71.     But for the representations and omissions of defendants as set forth above, plaintiff would not have offered and agreed to sell its products to On-Call at prices substantially less than the domestic price.

72.     In fact, defendants in conspiracy with one another willfully schemed to cause, and did in fact cause, the wrongful diversion of the Roche Products into the domestic marketplace in direct violation of TCS', On-Call's, Reis', Golden's, and Cooper's representations to plaintiff.

73.     The fraudulent conduct of defendants described above was part of a pattern of conduct directed at numerous consumer brand companies and at the public generally, which evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations.

74.     As a result of the foregoing, plaintiff has been severely injured in its business and property and has been damaged in a sum believed to be not less than $10 million and is entitled to punitive damages in excess of $30 million and prejudgment interest.

## COUNT II -AGAINST REIS, GOLDEN, COOPER, SCHWIMMER, AND TCS

## VIOLATION OF 18 U.S.C. 1962(c)

75.     Roche repeats and realleges paragraphs 1 through 74, inclusive, as if fully set forth at length herein.

76.     Defendants On-Call, Sion, and CMB are "Enterprises" within the meaning of 18 U.S.C. §1961(4), that TCS and the individual defendants, Reis, Golden, Cooper, and Schwimmer, operated through a pattern of racketeering.  TCS and each individual defendant is a "person" within the meaning of 18 U.S.C. § 1961(3) and conducted and participated in the affairs of the various enterprises within the meaning of 18 U.S.C. §1962(c).

77.     Defendant Reis, who possesses an ownership interest in and is associated with On-Call, TCS and, on information and belief, Sion, CMB, and other related companies, directly and indirectly, conducted and participated in conducting the affairs of these Enterprises through a pattern of racketeering activity, and in violation of 18 U.S.C.§ 1962(c), as set forth herein.

78.     Defendant Golden, who is and was associated with On-Call, TCS, Sion, and, on information and belief, CMB, and other related companies, directly and indirectly, conducted and participated in conducting the affairs of the Enterprises through a pattern of racketeering activity, and in violation of 18 U.S.C.§ 1962(c), as set forth herein.

79.     Defendant Schwimmer, who is and was associated with On-Call, TCS, Sion, and, on information and belief, CMB, and other related companies, directly and indirectly, conducted and participated in conducting the affairs of the Enterprises through a pattern of racketeering activity, and in violation of 18 U.S.C.§ 1962(c), as set forth herein.

80.     Defendant Cooper, who is and was associated with On-Call, TCS, and on information and belief, Sion, and CMB, and other related companies, directly and indirectly, conducted and participated in conducting the affairs of the Enterprises through a pattern of racketeering activity, and in violation of 18 U.S.C.§ 1962(c), as set forth herein.

81.     Defendant TCS, who is and was associated with On-Call, and on information and belief, Sion, and CMB, and other related companies, directly and indirectly, conducted and participated in conducting the affairs of the Enterprises through a pattern of racketeering activity, and in violation of 18 U.S.C.§ 1962(c), as set forth herein.

82.     The individual defendants and TCS, through use of the enterprises, unlawfully, willfully and knowingly devised, intended to devise, and executed a scheme and artifice to defraud Roche and other victims through defendants' use of the Enterprise in order to obtain the Roche Products from Roche at prices substantially below those available to Roche's legitimate domestic distributors and wholesalers by means of false and fraudulent statements, representations or promises and through the commission of numerous criminal acts.

83.     Through the commission of illegal predicate acts, defendants TCS and the individuals engaged in a pattern of racketeering activity affecting interstate commerce as defined by 18 U.S.C.§ 1961 (5), including, but not limited to, the following:

          a.   The Enterprise devised a scheme or artifice to defraud Roche (and other consumer product manufacturers) to obtain the Roche Products by false representations to Roche that the Roche Products would be used in the Call Kit Sampling Program and similar such programs, and used telephone and

30

facsimile wires and mails in interstate and foreign commerce to orchestrate, monitor and control the shipment, delivery and sale of the Roche Products;

b.  In furtherance of the above-described scheme to defraud Roche and others, said defendants did send and receive numerous oral communications through the use of interstate wires, in violation of 18 U.S.C. § 1343.  The wire communications and wire transfers of funds from On-Call to Roche, each one of which constitutes a distinct and separate offense in violation of 18 U.S.C. 1343, include, but are not limited to, any and all telephone calls and facsimile transmissions by and between employees or representatives of Roche and employees, representatives or agents of defendants on behalf of the Enterprise and, upon information and belief, by and between employees, representatives or agents of the Enterprise;

c.  In furtherance of the above-described scheme to defraud Roche and others, said defendants did send communications through the use of the U.S. Postal Service and by private or commercial interstate carrier in violation of 18 U.S.C. § 1341.  The mail communications constitute distinct and separate offenses in violation of 18 U.S.C. § 1341, include, but are not limited to, the mail communications listed in paragraph "(e)" below, and were by and between employees, representatives or agents of defendants on behalf of the Enterprise and employees or representatives of Roche; and, upon information

31

and belief, by and between employees, representatives or agents of the Enterprise;

d.  In relation to the violations of 18 U.S.C. §§ 1343 and 1341, the defendants are modern and sophisticated individuals and business operations.  Upon information and belief, they currently utilize, and have utilized, many types of modern personal and business communication techniques, including, but not limited to, standard landline telephones, mobile telephones, computer e-mail messages, and facsimile transmissions.  The defendants use these communication methods to order, invoice, approve transport, ship, arrange for payment, and otherwise furnish or procure the Roche Products in interstate commerce;

e.  The defendants conspired with one another on and caused the Enterprises to transmit numerous communications, including, but not limited to, the following communications through the use of the wires and the mails in interstate and/or foreign commerce:

    i.  In December 2005 through February 2006, Dumoulin was contacted via interstate telephone calls on at least three occasions, discussed herein, by a representative of TCS, expressing an interest in hiring Dumoulin as CEO;

ii.   In or about February 2006, Dumoulin was contacted by interstate telephone calls by defendants to describe On-Call's Call Kit sampling program and exclusive network of 6,500 independent pharmacies;

iii.   Upon information and belief, on or about February 22, 2006, Dumoulin was contacted via interstate telephone call by defendant Reis on behalf of TCS expressing an interest in hiring Dumoulin as her successor as CEO of TCS;

iv.   On February 21, 2006 defendants in New York shipped to Dumoulin in Indianapolis the On-Call Media Kit via the United Parcel Service;

v.   In or about March 14, 2006, Dumoulin received an interstate telephone call from defendant Reis inviting him to interview in New York;

vi.   In or about mid-April, defendant Cooper contacted Dumoulin by interstate telephone call and provided names of corporate references;

vii.   In or about early-May, Dumoulin received by interstate telephone calls, arranged and caused by the defendants, positive representations about by defendants by the references provided defendant Cooper via telephone;

viii.   In or about early-June 2006 defendant Reis contacted Dumoulin via interstate telephone call and suggested TCS and Roche do business and that TCS was a legitimate company that had never let down a business partner;

33

    ix.  In mid-June, 2006 an order was placed for goods for use in the promotional program by defendant Cooper via interstate telephone call;

    x.  On or about June 27, 2006, defendant Reis by interstate telephone call again invited Dumoulin, this time with his wife, to New York for continued job interviews and to examine apartments;

    xi.  On or about July 18, 2006, defendant Cooper faxed bank and delivery information for the shipment to Roche;

    xii.  In late August 2006, defendant Reis contacted Dumoulin via telephone to find if Roche was moving ahead with the promotional sale to the independent pharmacies and that she would go elsewhere if Roche were not interested since her members needed diabetes equipment;

    xiii.  On September 12, 2006, defendant Cooper faxed Roche purchase order, delivery instructions, warehouse FDA compliance, tax ID document, and shipment instructions.

    xiv.  Upon information and belief, on or about mid-December, 2006, Sion and CMB faxed to Walgreens an invoice which appeared to document the sale of all the goods purchased by On-Call from Roche to CMB.

84.    Defendants conspired with one another and caused the Enterprises to transmit numerous communications, including, but not limited to, the following communications through

the use of the wires and the mails in interstate and/or foreign commerce to other manufacturers using other defendant-affiliated companies, and at times, aliases:

    a.  Upon information and belief, since at least 1993 to 2004, over five hundred (500) telephone calls were made to contacts at numerous other targeted manufacturers by defendants and/or defendants' representatives, using various defendants-affiliated holding and/or promotional companies to offer the bogus high paying executive positions, in furtherance of their scheme, as reflected in the "Contact Sheets" annexed hereto as part of Exhibit A (Exhibits A and D to the Unilever Complaint), compiled and used by defendants, which is incorporated herein by reference;

    b.  Facsimile transmission dated February 22, 2000 from a representative of defendant-affiliated company Ultimate Senior Attitude located in New York to Melitta USA, Inc. located in Florida, enclosing Ultimate Senior Attitude's company and program information;

    c.  Purchase Order dated September 12, 2003, from defendant-affiliated company Perfect Score Marketing, Inc. located in New York, transmitted upon information and belief by U.S. Mail, to Hulman Company (Clabber Girl Corporation) located in Terre Haute, Indiana;

    d.  Letter dated September 8, 2004 from defendant Reis on behalf of defendant-affiliated company Native American Retail Ventures, Inc. located in New

York to Glaxo SmithKline located in Pennsylvania, transmitted via United
Parcel Service;

e.  Letter dated August 27, 2004 from a representative of defendant-affiliated
company Native American Retail Ventures, Inc. located in New York to
GlaxoSmithKline located in Pennsylvania enclosing "market research report,"
transmitted via United Parcel Service;

f.  Purchase Order dated March 29, 2004 from defendant-affiliated company
Future Stars Marketing, Inc. located in New York to Boots Healthcare USA,
Inc. located in Connecticut, transmitted by facsimile;

g.  CEO recruitment or marketing phone calls and fax or mailings of purchase
orders dated on or around August 22, 2001 from defendant-affiliated company
Grade-A Distribution located in New York to Jarden Corporation located in
Indianapolis, Indiana.

h.  CEO recruitment or marketing phone calls on or around October 23, 2003
from defendant-affiliated company Axis Holdings located in New York to
Bristol Myers Squibb located in Evansville, Indiana.

i.  CEO recruitment or marketing phone calls on or around May 1, 2003 and
August 1, 2003, from defendant-affiliated company Axis Holdings and Future
Stars Marketing located in New York to Carbolite Food, Inc. located in
Evansville, Indiana.

j.   CEO recruitment or marketing phone calls on or around April 1, 2002, from defendant-affiliated company Mercury Holding located in New York to Unilever located in Indianapolis, Indiana.

85.   In furtherance of the above described scheme to defraud Roche, defendants unlawfully, willfully, and knowingly transported, and caused to be transported the Roche Products, with the value of $5,000 or more, in interstate commerce, knowing the same to have been taken by fraud, in violation of 18 U.S.C. § 2314:  a Purchase Order dated September 12, 2006 from On-Call in New York, to Roche in Indiana reflecting shipment of the Roche Products to a warehouse in New Jersey.

86.   The numerous and fraudulent acts of TCS and the individual defendants constitute a pattern of racketeering activity affecting interstate commerce within the meaning of 18 U.S.C. § 1961(5) in that said illegal acts have a relationship to each other by reason of having similar objects, methods of commission, common victims, and similar means of transmission.

87.   There is a substantial threat that the Enterprise's racketeering activities will continue.  The racketeering activities associated with the Enterprise constitute defendants' ordinary method of doing business.

88.   By reason of the aforementioned racketeering Enterprise activities, defendants' ability to defraud Roche was immeasurably enhanced because the illegal operation of the Enterprises facilitated the fraud and aided its concealment, thereby damaging Roche in its business and property.

37

89.     As a result of the violations of 18 U.S.C. § 1962(c), Roche has been severely

injured in its business and property by more than $10,000,000, and is threatened with continued

injury and loss if the Roche products are not immediately returned and if defendants' further

actions are not stopped.

## COUNT III - AGAINST REIS, GOLDEN, COOPER, SCHWIMMER, AND TCS

## VIOLATION OF 18 U.S.C. 1962(a)

90.     Roche repeats and realleges paragraphs 1 through 89, inclusive, as if fully set

forth at length herein.

91.     Over at least a decade defendants Reis, Golden, Cooper, Schwimmer, and TCS

have committed numerous acts of mail and wire fraud in order to operate their enterprises.

Through these acts, defendants have derived, either directly or indirectly, substantial income.

The substantial income derived from these racketeering acts has been invested, directly or

indirectly, into the Enterprises which affect interstate commerce.  This illicitly derived income

has allowed defendants the funds needed to carry on their ruse of using the mail and wires to

seduce corporate executives and finance the purchases of goods through fraudulent

representations in violation of 18 U.S.C. §1961(a).  Without this illicitly obtained  income,

defendants would not have been able to perpetrate the fraud against Roche or obtain the Roche

goods they fraudulently induced Roche to sell to defendants at substantial discounts..

92.     As a result of the violations of 18 U.S.C. § 1962(a) by defendants, Roche has been

severely injured in its business and property by more than $10,000,000, and is threatened with

continued injury and loss if the Roche products are not immediately returned and if defendants'
further actions are not stopped.

## COUNT IV - AGAINST REIS, GOLDEN, COOPER, SCHWIMMER, AND TCS

## VIOLATION OF 18 U.S.C. § 1962(d)

93.     Roche repeats and realleges paragraphs 1 through 92 inclusive, as if fully set forth
at length herein.

94.     In violation of 18 U.S.C. § 1962(d), defendants Reis, Golden, Cooper,
Schwimmer, and TCS, each of whom is an entity "capable of holding a legal interest in
property," and therefore is a "person" as defined in 18 U.S.C. § 1961(3), conspired to engage in a
pattern of racketeering activity, as set forth above, and in violation of 18 U.S.C. § 1962 (a) and
18 U.S.C. § 1962(c).

95.     As a result of the violations of 18 U.S.C. § 1962(d) by defendants, Roche has
been severely injured in its business and property by more than $10,000,000, and is threatened
with continued injury and loss if the Roche products are not immediately returned and if
defendants' further actions are not stopped.

## COUNT V - AGAINST REIS, GOLDEN, COOPER, SCHWIMMER, AND TCS

## INDIANA STATE CORRUPT BUSINESS INFLUENCES

96.     Roche repeats and realleges paragraphs 1 through 95, inclusive as if fully set forth
at length herein.

97.     From December 2005 to September 2006, defendants Reis, Golden, Cooper,
Schwimmer, and TCS made over 20 material representations to Roche and its representatives in

Indiana related to the nature of On-Call as a business that provides goods for a sampling program as entrée into an exclusive nationwide network of 6,500 to 10,000 independent pharmacies. Defendants made additional representations as to their intentions not to divert the products sold to On-Call. These representations were patently false.

98. Defendants knew that neither the sampling programs nor the exclusive network of independent pharmacies in fact existed. Furthermore, from the outset, defendants' only intention was to obtain the Roche products at a substantial discount and then to divert those products to the wholesale market at a substantial profit for the defendants.

99. The purpose of defendants' representations was to induce Roche to part with $11.6 million worth of products for only $1.7 million, a substantial 85% discount. Defendants predicted that following the use of the Roche products in the sampling program a follow-on sale worth an estimated $35 million would be placed and Roche would gain brand exclusivity in the network of 6,500-10,000 stores. Defendants represented that this sale would be incremental and not interfere, conflict, or detract from with Roche's transactions with wholesalers or its regular customers. Had Roche known that, in fact, the goods being sold to On-Call were not intended for the agreed upon sampling program but, rather, were intended for the wholesale market, Roche would not have entered into the transaction with On-Call.

100. Roche relied to its substantial detriment on defendants' representations and, believing that the initial discount for a promotional program would lead to significant future sales and greater brand reach, sold the products to defendants at a significant discount from the true

value. This loss, proximately caused by defendants, caused injury to Roche in the amount of more than $10 million.

101.    Defendants promised that the goods sold to On-Call by Roche would be sent into a sampling program and not diverted into retail channels while knowing full well that this promise would not be performed.  Furthermore, through defendants representations they knowingly created, then confirmed, a false impression in Roche that the goods would be used for samples and not diverted into retail channels in order to exert unauthorized control of the Roche products.  Defendants pattern of willfully avoiding numerous opportunities to clarify their actions and intentions permitted defendants to exert continued control over the false impressions influencing Roche's decision to undertake the transaction with On-Call.

102.    Defendants actions under the common law of the State of Indiana and Ind. Code 35-43-4-2 and 35-43-5-4(8) along with similar fraudulent efforts defendants have attempted against other Indiana companies - including but not limited to Jarden Corp. and Clabber Girl Corporation - constitute a pattern of theft and fraud used to knowingly and intentionally derive proceeds in order to invest in and further a criminal enterprise in violation of Ind. Code 35-45-6-2 (1) and (3).

103.    As a result of the defendants' corrupt business influence, Roche has suffered actual damages of more than $10,000,000.  Pursuant to Ind. Code 34-24-2-6(b), Roche seeks damages in the amount of treble the actual damages awarded plus costs, fees, and any punitive damages awarded by the court or allowable under the law.

## COUNT VI - AGAINST ON-CALL AND TCS

41

## RESCISSION

104.    Roche repeats and realleges paragraphs 1 through 103, inclusive as if fully set forth at length herein.

105.    On-Call fraudulently misrepresented the intended use and purpose of products purchased.  Through defendants' oral representations and their alleged media kit, defendants led Roche to believe that all the products being purchased by On-Call would be entering the Call-Kit program and intended to serve as gift samples to potential vendors.  Roche relied on these representations and permitted On-Call an uncommonly low discount of 85%, selling $11.6 million worth of products to On-Call for only $1.7 million.

106.    On-Call further represented that following the initial order a follow-on order worth approximately $35 million to Roche would follow providing Roche products exclusivity in their brand categories in an alleged 10,000 store exclusive network when in fact no such network existed.  Roche was fraudulently induced into believing that a large discount on a relatively small amount of goods would lead to a large incremental sale into an untapped source of retailers.

107.    Roche was assured on numerous occasions by defendants, defendants' associates, and by the references provided by defendants that these products would not be diverted, sold to, or end up in Roche's normal retail channels.  But, upon information and belief, on October 24, 2006, On-Call purported to sell the entire product to a company called CMB.  The invoice, which is clearly a sham, reveals that the alleged purchaser has exactly the same address as the seller (in the very same suite) and that the shipment is to be to the same warehouse in New Jersey.  There is no reason to believe that the purported sale by On-Call to CMB (another shell company owned

42

and operated by the defendants), is anything other than a sham transaction or that the goods ever moved from the warehouse in New Jersey where Roche shipped them at the request of the defendants.

108.    By information and belief, as of January 4, 2007 the Roche products sold to On-Call by Roche and offered to Walgreens were still in the possession of defendants; therefore a request for rescission comes within a reasonable time.

109.    As a result of the fraud perpetrated against it by defendants, Roche seeks equitable rescission from the purchase agreement so as to return the parties to their pre-agreement positions.

**COUNT VII - AGAINST ON-CALL AND TCS**

**BREACH OF CONTRACT**

110.    Roche repeats and realleges paragraphs 1 through 109, inclusive as if fully set forth at length herein.

111.    During various phone calls in February 2006, defendant Cooper offered Roche, through its representative, Donald Dumoulin, an opportunity to take part in the Call-Kit program offered by TCS's core business, On-Call. She described a program wherein Roche would sell their products to On-Call at a significant discount, generally 85%, as consideration for entry into On-Call's sampling program. In this program, Cooper promised that the goods purchased at the 85% discount would be sent as gifts into an exclusive network of 6,500, later 10,000, independent pharmacies for the intended purpose of creating good will and a broader customer base for the products. Following the distribution of the samples, a marketing analysis would be

undertaken by an independent organization with a marketing report generated for use by Roche and On-Call to gauge customer satisfaction.  Cooper promised the goods would not be diverted for sale into retail channels.

112.    Cooper promised that once the product was deemed successful, subsequent orders are purchased at full price minus 2% cash discount, and all orders are paid prior to shipment via wire transfer.  Furthermore she claimed that 96% of tested product is successfully moved into full distribution and that On-Call was currently doing business with 25-30 reputable manufacturers, all of which now have exclusive distribution rights in the 6,500, later 10,000, independent pharmacies.

113.    On February 24, 2006, Roche received from defendants a media kit from Cooper which echoed her description of On-Call's Call-Kit program and stated that On-Call would use "its good faith efforts to distribute" the goods into the independent pharmacies.

114.    During the months of February through September 2006, Roche and defendants negotiated as to the size of the order that would be placed into the Call-Kit Program.  Initially, defendant Cooper placed an order for 318,000 units of diabetes care products in mid-June and faxed to Roche, on July 18, 2006, the necessary bank and delivery information for the order. Roche, believing this amount too much for a sampling program, proposed a counter-offer of only 188,984 pieces of equipment for the sampling program at the agreed upon 85% discount.  This counter-offer was accepted by defendant On-Call on or about September 12, 2006, when Cooper faxed Roche purchase order, delivery instructions, warehouse FDA compliance, tax ID document, and shipment instructions for the goods.

115.    The contract was fully executed on September 20, 2006 when the $11.6 million worth of products were shipped by Roche in response to On-Call's payment on September 19, 2006 for the agreed upon $1.7 million, with the 85% discount serving as consideration for entry into the Call-Kit program and the future sale worth $35 million.

116.    The Roche products shipped to On-Call were never sent into a sampling program and, in December 2006, On-Call, acting in complicity with the other defendants, attempted to divert and sell over 90% of the Roche products into retail channels.

117.    On-Call, acting in complicity with the other defendants, has breached its agreement with Roche by diverting and attempting to sell the Roche Products in the domestic market rather than providing the products as samples through the Call Kit Program.  They are acting in the direct contravention of the agreements and promises made by defendants Reis, Cooper, and Golden and the terms of On-Call's Media Kit, thus breaching the parties' oral contract.

118.    The actions taken by On-Call resulting in the breach of the contract between itself and Roche were accompanied by malice and fraud.  Defendants' acts were the result of planned, blatant, and intentional tortious conduct and were in no way a result of mistake of law or fact, honest error of judgment, overzealousness, mere negligence, or other non-iniquitous human failing.  This is evidenced, in part, by the duration of the scheme perpetrated against Roche and its executive, Dumoulin, as well as the countless other companies targeted by the same scheme over at least the past decade.

## COUNT VIII - AGAINST ON-CALL

45

## CONVERSION

119.    Roche repeats and realleges paragraphs 1 through 118, inclusive as if fully set forth at length herein.

120.    Through their fraudulent actions and misrepresentations, defendants exercised unauthorized dominion over Roche's rightful property, the Roche products, and have withheld it from Roche's lawful possession under a lesser claim of title and in defiance of Roche's right of possession.

121.    As a result of defendants' conversion, Roche has lost the fair market value of the property, which, at the time of defendants' conversion, was valued at $11.6 million in good condition.

## COUNT IX - AGAINST ON-CALL, TCS, CMB, AND SION

## REPLEVIN
### (Requesting the return of goods sold to On-Call to Roche)

122.    Roche repeats and realleges paragraphs 1 through 121, inclusive as if fully set forth at length herein.

123.    Roche requests the Court, under the remedy of replevin, to order the corporate defendants to return to Roche the Roche Products sold to On-Call. Roche is the lawful owner of the products and has the right to the immediate possession of the products due to the delicate nature of some of the products, namely the glucose test strips. Sion, as an enterprise of the defendants, has received these products through fraud and is in wrongful possession of the goods that were to be sold to a sampling program. Since some of these products may still be salvageable, they retain high retail value.

46

**DEMAND FOR RELIEF**

WHEREFORE, plaintiff demands judgment against defendants, jointly and severally, as follows:

    i.  on Count I, awarding plaintiff a sum believed to be not less than $10,000,000 plus punitive damages in excess of $30,000,000 and prejudgment interest;

    ii.  on Counts II, III, and IV, pursuant to 18 U.S.C. §§ 1962(a), (c), and (d) and 1964(c), awarding threefold plaintiff's damages sustained in a sum to be determined at trial, but believed to be not less than $10,000,000 and reasonable attorneys' fees and costs, and prejudgment interest; and a preliminary and permanent injunction enjoining defendants from transferring Roche's property or taking any further actions to facilitate their fraud;

    iii.  on Count V, pursuant to Ind. Code 35-45-6-2 and 34-24-2-6(b), awarding threefold plaintiff's damages sustained in a sum to be determined at trial, but believed to be not less than $10,000,000 and reasonable attorneys' fees and costs, and prejudgment interest; and a preliminary and permanent injunction enjoining defendants from transferring Roche's property or taking any further actions to facilitate their fraud;

    iv.  on Count VI, pursuant to Ind. Code 26-1-2-721, the equitable rescission of the purchase agreement between Roche and On-Call, and recovery of the products by Roche and a preliminary and permanent injunction enjoining defendants

from transferring Roche's property or taking any further actions to facilitate their fraud;

v.   on Count VII, awarding damages in a sum to be determined at trial, but believed to be not less then $10,000,000 in compensatory damages and so as to exact a deterrent effect on defendants' punitive damages in excess of $30,000,000 and prejudgment interest;

vi.  on Count VIII, awarding damages in the sum of $11.6 million plus interest, or the value of the goods that are not returned or that are damaged plus interest;

vii. on Count IX, the immediate return of the Roche products;

viii. on all Counts, such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: Indianapolis, Indiana
January 9, 2007

BARNES AND THORNBURG LLP

By:

Larry A. Mackey (#11740-49)
Kendall Millard (#25430-49)
11 South Meridian Street
Indianapolis, Indiana 46204-3535
(317) 236-1313

-AND-

ARNOLD & PORTER LLP

Irvin B. Nathan
Alexander Major
555 Twelfth Street, NW
Washington, DC  20005
(202) 942-5000

*Counsel for Plaintiff Roche Diagnostics
Corporation*

49